IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2023

## IN RE MADILYN B.

**Appeal from the Circuit Court for Robertson County**
**No. 74CC1-2021-CV-193  Adrienne Gilliam Fry, Judge**
_____

**No. M2023-00035-COA-R3-PT**
_____

Father appeals the trial court's finding of abandonment by wanton disregard as a ground for termination of his parental rights, as well as its finding that termination was in the best interest of the child. We affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P. J., W.S., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JEFFREY USMAN, J., joined.

Joe R. Johnson, II, Springfield, Tennessee, for the appellant, Thomas B.

Nathan Zale Dowlen, Goodlettsville, Tennessee, for the appellee, Nikki M.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves the termination of the parental rights of Respondent/Appellant Thomas B.[1] ("Father") to a minor child. The child was born in November 2017 to Father and Co-Petitioner/Appellee Sadie M. ("Mother") (together, "the parents").[2] During the pregnancy, Mother was using drugs and the child was born premature and drug exposed. Father was incarcerated in Davidson County when the child was born.

---

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[2] After Mother failed to respond to its earlier show cause order, this Court determined that the appeal would continue without a brief on Mother's behalf by order of June 30, 2023. This case arises solely from Father's appeal of the termination of his parental rights, and we will discuss Mother's involvement only as necessary.

The Tennessee Department of Children's Services ("DCS") became involved with the child immediately after her birth. The child was placed in the temporary custody of her maternal aunt, Petitioner/Appellee Nikki M. ("Petitioner") on December 1, 2017. Petitioner gained full physical and legal custody of the child in November 2019 pursuant to dependency and neglect proceedings brought by DCS in the Davidson County Juvenile Court ("the juvenile court").[3] The juvenile court left the parents' visitation with the child in the discretion of Petitioner. The child has remained in Petitioner's custody since leaving the hospital for the first time.

Petitioner filed a petition for termination of parental rights and adoption in the Robertson County Circuit Court ("the trial court") on August 3, 2021. Mother signed the petition, indicating her consent to the termination and adoption. As to Father, Petitioner raised the grounds of (1) abandonment by failure to visit before incarceration; (2) abandonment by failure to support before incarceration; (3) abandonment by wanton disregard; (4) failure to seek visits, failure to assume custody, and risk of substantial harm; and (5) failure to manifest an ability and willingness to assume custody of the child. Petitioner also alleged that terminating Father's parental rights was in the best interest of the child. And with Father's rights terminated and Mother's consent, Petitioner alleged that her adoption of the child was in the child's best interest. Father, by and through appointed counsel, filed an answer in opposition to the petition on November 30, 2021.

The matter was heard by the trial court on October 18, 2022. The child was almost five years old. Father appeared in person and was called as Petitioner's first witness. Father testified that he was presently incarcerated in Morgan County. He stated that he was originally arrested in Davidson County in October 2017, and then transferred between four other counties where he had received charges. Father explained that although he had changed facilities multiple times, his ongoing incarceration was all related to the same initial offenses. Father testified that his charges were the most serious in Sumner County, with multiple counts of forgery, aggravated burglary, and theft, and misdemeanor charges dating back to 2016 in the other counties. Father explained that he was released on bond multiple times between October 16, 2017, and December 9, 2019, and had short periods where he was not incarcerated, including in March 2018 and January 2019. He stated that after finishing a class while in Sumner County, he entered into a Community Corrections program on December 9, 2019. Father was charged with a fourth driving under the influence ("DUI") offense five days later, which also resulted in a violation of probation charge in Sumner County.

Father admitted that he had not given any thought to his children during his illegal activity. He explained that his criminal behavior began with a pain pill addiction after a

---

[3] By the same order, custody of Father's older daughter remained with his grandmother, the child's paternal great grandmother. Father later testified that he had a third, older child, to whom he had no rights. This appeal does not involve the older children.

military service-related injury in 2010, which then became an opiate addiction that included heroin. Father testified that he and Mother had chosen to have children while actively addicted to opiates and heroin. Stealing was a last resort method of providing for his children and for funding his addiction. Father stated that his behavior would change after his release and that he would never make the same mistakes again. Father also testified to his military service-related post-traumatic stress disorder diagnosis. He explained that he did not take any medications for the disorder and had not received treatment while incarcerated. Father also stated that his bipolar disorder had not been addressed while he was incarcerated. But Father stated that he would seek treatment with Veterans Affairs for his mental and physical health after being released.

Father explained that he was up for parole in January 2023 and believed he was "in a position possibly" to be able to raise the child when released in February 2023. He would remain on parole until approximately 2026. He had not received any disciplinary writeups while incarcerated. Father expressed that he is a completely different person than before and now thinks about the consequences of his actions. Father explained that he would be staying with his grandmother once granted parole and that her home would be appropriate for the child to spend time in if he was allowed visitation. He also testified to having three different well-paying employment opportunities with which he could financially support the child. Father testified that he had "confronted all [his] demons" and the issues from his past, and that there were no remaining obstacles that could not be overlooked or handled.

Father testified that he had not actually raised any of his three children. He did not know the child's favorite cartoon character or toy. Father testified that he was incarcerated when the child was born and had only seen the child twice in person for a couple of hours, during short periods when he had made bond. Father testified that he had "never been allowed to" pay support or send gifts for the child despite asking Petitioner about sending money. Father did not recall receiving any paperwork regarding child support or the proceedings in the juvenile court. Father admitted that he had sent Petitioner a letter in August 29, 2021, indicating his intention to relinquish his rights as being in the best interest of the child, and requesting information on how to simplify the process. After sending the letter, Father received the termination petition and eventually no longer felt Petitioner's adoption of the child was in the child's best interest. Father testified that he and the child did not have a bond but could form one if given the opportunity.

Mother, another of Petitioner's sisters, and two of the child's daycare providers testified to the strong relationship between Petitioner and the child. Finally, Petitioner testified. She explained that she has had custody of the child since she brought the child home from the hospital in December 2017. The child was born four weeks premature, weighed only four pounds, eight ounces, and needed twice weekly doctor's visits for the first six weeks of her life. Petitioner explained that she could do nothing but watch the child suffer through full drug withdrawal after being born addicted.

-3-

Petitioner testified that she had been married when she first gained custody of the child but filed for divorce when the child was about one year old. She met her current partner a year later and he lives with herself and the child. The child knows Petitioner as "mommy" and Petitioner's partner as "daddy." Petitioner has a twelve-year-old daughter, who the child thinks of as her sibling. Petitioner explained that she and the child have a significant support network and the child does not know anything different from her current situation. Petitioner testified that she wanted to adopt the child because she has cared for the child "since day one" and does not look at their relationship as any different than having given birth to the child herself.

Petitioner testified that after Father sent his August 2021 letter about relinquishing his rights, Father requested $500.00 for signing the termination paperwork and paying his attorney, a claim that Father later disputed. Petitioner testified that Father did not contact her as regularly or as often as he testified that he had, which Father also disputed. Petitioner explained that she was not willing to give Father the benefit of the doubt because he has either been an addict or in prison the entire time she has known him and he has not given her any indication that there is hope for change. Petitioner testified that she has not felt comfortable having a "full-blown relationship" with Mother and that Mother has not been around her older daughter due to Mother's addiction. Petitioner stated that her older daughter was adopted and had recently chosen to meet her biological father, and that she planned to give the child the same opportunity to choose to meet Father. But Petitioner explained that she thinks it is important for the child to legally be part of her family and have the resulting permanency and stability.

Lastly, Father's grandmother, the child's great grandmother ("Grandmother") testified on Father's behalf. She explained that Father would come to live with her and his older daughter upon his anticipated release in February 2023. There is space for the child to visit and Grandmother testified that she would be able to supervise Father's visitation with the child if so required by the trial court. Father would not be welcome in Grandmother's home if he began using drugs again.

At the end of the proof, Petitioner's counsel explained that they had not known the extent of Father's criminal history when the petition was filed. Thus, the grounds of willful abandonment by failure to visit and by failure to support were likely inapplicable based on the timing requirements of the grounds. As such, Petitioner's counsel explained that the only provable ground was abandonment by wanton disregard. Father's counsel admitted that wanton disregard was probably a ground for termination, but disagreed that termination was in the child's best interest.

The trial court terminated Father's rights by order of December 13, 2022. The order provided a full account of the testimony offered at trial. The trial court concluded that the only ground Petitioner had proven by clear and convincing evidence was abandonment by wanton disregard, finding that Father "had knowledge of the existence of the child, [and

that] he engaged in conduct prior to, during, and after incarceration that exhibited a wanton disregard for the welfare of the child." As to the child's best interest, the trial court found that several factors were inapplicable or difficult to determine based on Father's incarceration but that twelve factors favored termination. Father thereafter appealed to this Court. Father asks us to review the trial court's ruling as to both the finding of the ground for termination of wanton disregard and the finding that termination of his parental rights is in the child's best interest.

## II. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016) (collecting cases). In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). "[P]arents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (citation omitted); *accord* *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018) ("Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases.").

Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522. The standard "ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24. "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citation omitted).

# III. ANALYSIS

## A. Grounds for Termination

The trial court found that only one of the pleaded grounds for terminating Father's parental rights had been proven by clear and convincing evidence: abandonment by wanton disregard. Tennessee Code Annotated section 36-1-113(g)(1) provides abandonment by a parent as a ground for the termination of parental rights and, in turn, Tennessee Code Annotated section 36-1-102 defines the term "abandonment." Under that section as it existed at the time the petition was filed, abandonment by wanton disregard is applicable when:

> A parent or guardian is incarcerated at the time of the filing of a . . . petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has . . . engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). This statutory language balances the idea that "incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child[,]" with the notion that "incarceration alone in not an infallible predictor of parental unfitness." *In re Audrey S.*, 182 S.W.3d at 866. Thus, "incarceration alone [is not] a ground for the termination of parental rights." *Id.* Instead, a parent's incarceration acts as a "triggering mechanism" that allows courts to examine the child's situation more closely, so as "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

Although section 36-1-102(1)(A)(iv) does not specifically define "wanton disregard," "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). Many cases have held that a "parent's previous criminal conduct, coupled with a history of drug abuse, constitutes a wanton disregard for the welfare of the child." *In re Navada N.*, 498 S.W.3d 579, 602 (Tenn. Ct. App. 2016); *see also, e.g., State v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *8 (Tenn. Ct. App. Jan. 11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004); *State v. Wiley*, No. 03A01-9903-JV-00091, 1999 WL 1068726, at *7 (Tenn. Ct. App. Nov. 24, 1999); *In the Matter of Shipley*, No. 03A01-9611-JV-00369, 1997 WL 596281, at *5 (Tenn. Ct. App. Sept. 29, 1997). Furthermore, "probation

violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child" can constitute conduct demonstrating a wanton disregard for the child. *In re Audrey S.*, 182 S.W.3d at 867–68. Additionally, in considering whether the parent's behavior exhibited wanton disregard for the child, we may look beyond the four months immediately preceding incarceration, so long as the parent knew of the child's existence. *See id.* at 865 ("This test has no analog to the first statutory definition of abandonment, and it is not expressly limited to any particular four-month period."); *In re Anthony R.*, 2015 WL 3611244, at *3 ("Logically, a person cannot disregard or display indifference about someone whom he does not know exists."). To be sure, "Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero." *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *8 (Tenn. Ct. App. July 6, 2017) (citing *In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017) ("For a child in utero, we primarily have found wanton disregard where a parent, after learning of the pregnancy, commits the crime for which he or she is subsequently incarcerated.")).

As an initial matter, there can be no dispute that Father was incarcerated both at the time the child was born in November 2017 and during the four months preceding the August 2021 filing of the petition for termination and adoption, with only short periods of non-incarceration in between where Father made bond or was participating in the Community Corrections program. Thus, Father is within "the class of people to whom the statute applies." *In re Audrey S.*, 182 S.W.3d at 870.

Turning to the question of whether Father exhibited a wanton disregard for the child prior to his incarceration, we note that no question has been raised that Father knew Mother was pregnant when he engaged in the conduct resulting in his arrest and ongoing imprisonment. Indeed, Father testified that the parents had purposely conceived the child while actively addicted to opiates.

At trial, Father did not attempt to downplay his criminal history. He acknowledged that he was not thinking of the child when he was committing crimes across several counties, including multiple counts of forgery, aggravated burglary, and theft. His illegal conduct that lead to his present incarceration dated back to 2016 and continued until only a month before the child was born. It therefore appears that Father was continuing to commit crime during the time frame in which he and Mother intentionally conceived the child and even after he had knowledge of the child's existence. Father also readily admitted his pre-incarceration opiate addiction, use of heroin, and previous misuse of pain pills. A parent's criminal conduct and drug abuse certainly reflect a "me first" attitude evincing an indifference to the effects on the child, *In re Anthony R.*, 2015 WL 3611244, at *3, and together have been held to constitute wanton disregard for the welfare of the child. *See In re Navada N.*, 498 S.W.3d at 602. Certainly, consciously choosing to conceive a child while both parents are addicted to opiates and heroin can be considered as part of the constellation of facts that make up wanton disregard for that child's welfare. Additionally,

within five days of his brief release from incarceration into the Sumner County Community Corrections program in December 2019, Father committed his fourth DUI offense, which also constituted a violation of his probation. *See* **In re Audrey S.**, 182 S.W.3d at 867–68. Under all of these circumstances, we conclude that there is clear and convincing evidence to support the trial court's conclusion that Father engaged in wanton disregard for the child despite his knowledge of her existence prior to his current incarceration.

## B. Best Interest

Because we have determined that a statutory ground for terminating Father's parental rights has been proven, we must now decide if Petitioner has proven, by clear and convincing evidence, that termination of Father's rights is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). The factors that courts should consider in ascertaining the best interest of child include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol,

controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i).

Determining a child's best interest does not entail simply conducting "a rote examination" of each factor and then totaling the number of factors that weigh for or against termination. *In re Audrey S.*, 182 S.W.3d at 878. Instead, the "relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *White*, 171 S.W.3d at 194). Moreover, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Audrey S.*, 182 S.W.3d at 878). Thus, "[w]hen the best interest

of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

Here, in determining that the termination of Father's parental rights was in the child's best interest, the trial court explicitly found that factors (F), (G), (J), (K), (N), (Q) and (R) were inapplicable or difficult to assess based on Father's incarceration and factor (L) was inapplicable based on the lack of DCS involvement, but that the twelve remaining factors were relevant and favored termination. Our Supreme Court has established that "the best interests analysis is and must remain a factually intensive undertaking," and so we must "consider all of the statutory factors, as well any other relevant proof any party offers." *In re Gabriella D.*, 531 S.W.3d at 682. We therefore consider each factor on appeal.

We look first to those factors related to the child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others), (T) (involving the effect of the parent's mental and emotional fitness on the child). Here, the child has only ever lived with Petitioner. She knows Petitioner as "mommy" and Petitioner's family as her own. Terminating Father's parental rights would only improve the child's stability within Petitioner's family. Although Father testified that he would seek mental health treatment upon being granted parole, at the time of the termination hearing he was not receiving support for either his post-traumatic stress disorder or his bipolar disorder. And because he has been incarcerated since before she was born, Father has met the child only twice and is not the person the child thinks of as her father. Reintroducing the child to someone who is essentially a stranger would have a negative impact on the child's wellbeing. These factors clearly support termination.

Next, we address those factors involving the physical environment of the child and the parent. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). Like the trial court found, these factors are somewhat difficult to address, as Father remained incarcerated at the time of the termination hearing. Thus, there is no home of Father's for the child to be fearful of or triggered by visiting, nor any health, safety, abuse, or neglect to discuss. Father does intend to live with Grandmother upon being released on parole. Grandmother explained that any drug use by Father in the home would not be tolerated. As Grandmother has custody of Father's older daughter, it would seem that her house is suitable for the child to visit. However, that Father does not have custody

of his two older children implicates his ability to provide safe and stable care prior to his incarceration. On the whole, these factors do not weigh against termination.

We turn to those factors concerning the efforts made by the parent. *See* Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving the parent's sense of urgency), (P) (involving the parent's understanding of the child's basic needs). As an initial matter, factor (L) is inapplicable in this case based on DCS's noninvolvement with the termination petition. We acknowledge that Father testified to his good behavior and completion of some programs while incarcerated, his sobriety, and his intent to never make the same mistakes again. However, Father explained that he received his fourth DUI charge shortly after completing a class and being released into the Sumner County Community Corrections program. Father has also not been receiving treatment for his mental health while incarcerated. Thus, we are not convinced that Father has made an effective use of his available resources. Nor are we able to say that there is evidence of any sense of urgency for reunification by Father, especially considering the acceptance of the risk of additional incarceration and time away from the child evident in Father's criminal behavior even after the birth of the child, as well as Petitioner's testimony that Father's two visits with the child were orchestrated by other members of his family and not Father himself. And like the last group of factors, it is difficult to address any lasting change in Father's circumstances or his understanding of and ability to meet the child's needs without the ability to discuss Father's circumstances and behavior outside of incarceration. Certainly, he has not exhibited any ability to maintain his sobriety or live a drug-free lifestyle outside the controlled environment of jail. *See, e.g.*, **In re Zakary O.**, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *12 (Tenn. Ct. App. Aug. 15, 2023) (noting that in order to determine whether a parent can parent his or her child, his or her "sobriety must be tested outside of [a] controlled environment"). So again, these factors do not weigh against termination.

The final factor involves "[w]hether the parent has consistently provided more than token support for the child." Tenn. Code Ann. § 36-1-113(i)(S). Father admitted that he has not provided any financial support for the child. The trial court did not credit Father's testimony that Petitioner in any way prevented him from financially providing for the child. And "[w]e refrain from second-guessing the factual findings that were based on the trial court's credibility determinations unless clear and convincing evidence demonstrates error." **Coleman v. Coleman**, No. W2012-02183-COA-R3-CV, 2013 WL 5308013, at *12 (Tenn. Ct. App. Sept. 19, 2013). This factor supports termination.

According to our review, the majority of the applicable factors weigh in favor of terminating Father's parental rights. The remaining factors are difficult to address based on Father's imprisonment at the time the termination petition was heard. In discussing the child's best interest, Father asserts that he is not seeking an immediate change of custody

of the child; nor could he, considering his ongoing incarceration. Instead, Father maintains that he wishes only to have a relationship with the child. But while determination of the child's best interest may not be reduced to a simple tallying of the factors for and against termination, *see In re Audrey S.*, 182 S.W.3d at 878, especially considering the similarities between the factors, we cannot help but acknowledge the overwhelming sense that the child's life will not be improved by a reintroduction to Father. Here, from the child's perspective, we must conclude that the most important factors are the lack of any meaningful relationship between the child and Father and the detrimental effect that a change in caretakers and environment would cause as a result. *See In re Addalyne S.*, 556 S.W.3d at 795–96 ("This Court has previously indicated that in some cases the lack of a meaningful relationship between a parent and child is the most important factor[.]"); *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *21 (Tenn. Ct. App. July 22, 2020) (reasoning that "when the parent and the child are essentially strangers, the lack of meaningful relationship between the parent and child carries considerable weight in favor of termination"). With all of the above in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the child. Accordingly, we affirm the trial court's ultimate decision to terminate Father's parental rights.

## IV. CONCLUSION

The judgment of the Robertson County Circuit Court terminating Appellant Thomas B.'s parental rights to Madilyn B. is affirmed. Costs of this appeal are taxed to Appellant for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

-12-